UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COREY PRIDE,

          Plaintiff,

v.

CITY OF DETROIT, a Michigan
municipality, NICHOLAS ROCHA,
MICHAEL AYALA, and
TYLERSCOTT ALLEYENE, in their
individual and official capacities,

          Defendants.
_____/

Case No: 23-10243

Honorable Nancy G. Edmunds
Mag. Judge Kimberly G. Altman

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [12]**

Plaintiff Corey Pride brings this case under 42 U.S.C. § 1983 for alleged violations

of the Fourth and Fourteenth Amendments to the United States Constitution. Before the

Court is Defendants' motion for summary judgment. (ECF No. 12.) Plaintiff filed a

response in opposition to Defendants' motion. (ECF No. 16.) Defendants filed a reply.

(ECF No. 17.) Under Eastern District of Michigan Local Rule 7.1(f)(2), the motion will be

decided without oral argument. (ECF No. 13.) For the reasons that follow, Defendants'

motion is GRANTED IN PART and DENIED IN PART.

**I.    Background**

This case stems from events which occurred during the evening of June 19, 2020,

culminating in Plaintiff's arrest. Defendants Alleyne, Rocha, and Ayala, each a Detroit

Police Department officer at the time, were on patrol in their scout car on Manistique St. in

Detroit, Michigan. (ECF Nos. 1; 12.) Defendants observed Plaintiff enter the driver side of

a Chevrolet Malibu ("the vehicle") parked on the street, approached him in their scout car, asked Plaintiff to exit the vehicle, patted Plaintiff down for weapons, and then searched the vehicle. (ECF No. 12, PageID.80.) They found and confiscated a handgun wedged between the console and either the passenger seat[1] or the driver seat. *Id.* After Defendants determined Plaintiff did not have a permit to carry a concealed weapon, they arrested him. *Id.* at 80-81. Several details of the events immediately preceding Plaintiff being stopped and through his arrest are disputed by the parties.

According to Defendants, as they approached the vehicle Plaintiff was in, Officer Alleyne observed an L-shaped bulge in Plaintiff's pocket resembling a handgun. (ECF No. 12, PageID.80-82.) As Defendants got closer to Plaintiff, they observed him "blade his body away from them and quickly get into the vehicle." *Id.* at 83. Additionally, Defendants Alleyne and Ayala observed Plaintiff make a stuffing motion towards the center console after he entered the vehicle. *Id.* at 80. As Defendants pulled their scout car next to the vehicle, Defendant Alleyne motioned with his hands for Plaintiff to get out of the vehicle. *Id.* Plaintiff exited the vehicle and was patted down for weapons before Defendant Alleyne searched the vehicle. *Id.* Defendant Alleyne recovered a handgun from the vehicle and Plaintiff was arrested. *Id.* at 80-81.

Plaintiff argues he did not display an L-shaped bulge in his pocket and did not make any quick or otherwise "furtive" movements in the way he entered the vehicle. (ECF No. 16, PageID.226.) Plaintiff also notes that the pat-down yielded no weapons prior to the vehicle search. *Id.* at 219.

---

[1] In their motion for summary judgment, Defendants state the weapon was wedged between the driver seat and the console while Defendant Alleyne's police report and his bodycam footage reflect the handgun was found wedged between the console and the passenger seat. (ECF Nos. 12, PageID.80; 12-3, PageID.138; 12-4.)

## II.     Standard of Review

"The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine dispute of material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts look to the applicable substantive law to determine materiality as "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will . . . preclude . . . summary judgment." *Id.* The moving party has an initial burden to inform the court of the portions of the record "which it believes demonstrate the absence of a genuine dispute of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the non-moving party must make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322-23. To do so, the non-moving party must present enough evidence "on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Finally, the court "consider[s] all facts and inferences drawn therefrom in the light most favorable to the nonmovant." *City of Wyandotte v. Consol. Rail. Corp.*, 262 F.3d 581, 585 (6th Cir. 2001).

## III.    Analysis

### A.      Plaintiff's Claims Against Defendant Alleyne

Plaintiff claims Defendant Alleyne violated his Fourth Amendment right to be free from unreasonable searches and seizures when he stopped and frisked Plaintiff absent a reasonable suspicion that he was engaged in criminal activity and when Defendant Alleyne searched the vehicle and arrested him without probable cause. (ECF No. 1.)

Plaintiff brings this case under 42 U.S.C. § 1983, which allows individuals to recover damages "for injuries caused by the deprivation of constitutional rights . . . ." *Carey v. Piphus*, 435 U.S. 247, 254 (1978). In doing so, § 1983 serves to "deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights . . . ." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (citing *Carey*, 435 U.S. at 254-57). To succeed on a § 1983 claim, a plaintiff must show they were deprived of a right secured by the Constitution or federal law, and the deprivation was caused by a person acting under color of state law. *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003).

Each Defendant claims he is entitled to qualified immunity from Plaintiff's claims. (ECF Nos. 3; 4.) In deciding whether an official is entitled to qualified immunity, courts must resolve first whether, "viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation occurred?" *Silberstein v. City of* Dayton, 440 F.3d 306, 311 (6th Cir. 2006). And "[s]econd, was the right clearly established at the time of the violation?" *Id.*[2]

### 1. Whether There Has Been an Underlying Deprivation of Rights

The Fourth Amendment protects "'[t]he right of the people to be secure in their persons, houses, papers, and effects,' including vehicles, 'against unreasonable searches and seizures.'" *United States v. Snoddy*, 976 F.3d 630, 633 (6th Cir. 2020) (quoting U.S. Const. amend. IV). These protections "extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968); *United States v. Cortez*, 449 U.S. 411,

---

[2] Courts are not required to consider the two prongs for resolving qualified immunity in sequential order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("judges of the district courts . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first . . .").

417 (1981)). A brief investigatory stop of a person or vehicle is commonly known as a *Terry* stop. *See Terry*, 392 U.S. at 19. To effectuate a *Terry* stop, an officer must have reasonable suspicion that the person stopped has committed or is about to commit a criminal offense. *Arvizu*, 534 U.S. at 273 (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Cortez*, 449 U.S. at 417).

"Reasonable suspicion requires 'more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause . . . .'" *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012) (quoting *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008)). An officer's reasonable suspicion must be based upon "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 449 U.S. at 417-418. Additionally, courts "must examine the totality of the circumstances" surrounding the stop "to determine whether reasonable suspicion existed to justify a *Terry* stop." *Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006) (internal quotation marks omitted) (citing *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813-814 (6th Cir. 1999)). Further, police officers are entitled to evaluate the totality of the circumstances available to them in combination with their training and experience when determining whether reasonable suspicion exists. *See Cortez*, 449 U.S. at 419; *Lyons*, 687 F.3d at 763.

Generally, a search or seizure must be conducted pursuant to a warrant issued for that purpose upon a showing of probable cause. *See* U.S. Const. amend. IV; *California v. Carney*, 471 U.S. 386, 390 (1985). There are, however, exceptions to this general rule. *Carney*, 471 U.S. at 390. Under the automobile exception, police officers can conduct a search of a "readily mobile vehicle without a warrant if they have probable cause to

believe that the vehicle contains evidence of a crime." *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998). Probable cause requires a fair probability that contraband or evidence of a crime will be found in a particular place. *United States v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002) (citing *Lumpkin* 159 F.3d at 986). As with reasonable suspicion, the probable cause inquiry is determined by looking at the totality of the circumstances leading up to the search. *Id.* Probable cause is likewise determined by evaluating all facts and circumstances through the view of an officer's training and experience. *Illinois v. Gates*, 462 U.S. 213, 231-232 (1983) (citing *Cortez* 449 U.S. at 418).

Here, viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude Defendants did not have a reasonable suspicion that Plaintiff was engaged in criminal activity, and stopping Plaintiff was unconstitutional. Plaintiff's assertions that he did not display an L-shaped bulge are supported by the record. Plaintiff testified that he did not have a gun on him. (ECF No. 16-2, PageID.246.) On the other hand, Defendants rely upon Defendant Alleyne's police report to support their claim that he did observe such a bulge and had reasonable suspicion. (ECF No. 12, PageID.87.) As for the other circumstances relevant to whether there was reasonable suspicion, Defendant Rocha testified he could not see whether Plaintiff had any objects on his person at the distance from which he observed Plaintiff. (ECF No. 12-6, PageID.149.) Defendant Rocha also testified he saw no L-shaped object on Plaintiff nor any "blading of his body." *Id.* at 156. Defendant Ayala testified Defendants were "at least a hundred yards away" from Plaintiff as he entered the vehicle, and Defendant Ayala could not see whether Plaintiff had anything in his pocket from that distance. (ECF No. 12-2, PageID.102, 113.) Additionally, Defendant Rocha testified he did not observe Plaintiff

make any furtive movements while getting into or sitting in the vehicle. (ECF No. 12-6, PageID.149.) Thus, both parties have pointed to evidence supporting their positions, and Plaintiff has presented enough evidence to allow a reasonable jury to find Defendants lacked an objective basis upon which to form a reasonable suspicion he was engaged in criminal activity. Weighing that evidence is a task for a jury.

The same result applies to Defendant Alleyne's search of the vehicle. Defendants rely on the same arguments to support the vehicle search as those they rely on to support reasonable suspicion for the *Terry* stop. (*See* ECF No. 12, PageID.86-87.) As noted above, one officer — Defendant Rocha — testified Plaintiff made no furtive movements in the vehicle. (ECF No. 12-6, PageID.149.) Both Defendants Rocha and Ayala testified they could not see any L-shaped bulge on Plaintiff as he entered the vehicle. (ECF Nos. 12-6, PageID.149; 12-2, PageID.102, 113.) This evidence would allow a reasonable jury to find there was not probable cause to search the vehicle.

### 2.  Whether Plaintiff's Rights Were Clearly Defined

A person's right to be free from a *Terry* seizure absent a reasonable suspicion that the person being stopped is engaged in criminal activity is well established. The same is true of an individual's right to be free from warrantless searches without probable cause. Accordingly, Defendant Alleyne is not entitled to qualified immunity from Plaintiff's suit and the issues raised by Plaintiff's claims of constitutional rights violations by Defendant Alleyne are best left to a jury.

### B.     Plaintiff's Claims Against Defendants Ayala and Rocha

Plaintiff claims Defendants Ayala and Rocha are liable to him for their failure to

intervene and stop the alleged violations of Plaintiff's constitutional rights by Defendant Alleyne. (ECF No. 16, PageID.228.) In this Circuit, "[e]ven nonsupervisory officers who are present at the scene of a violation of another's civil rights and who fail to stop the violation can be liable under section 1983." *Smith v. Heath*, 691 F.2d 220, 225 (6th Cir. 1982) (citing *Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982); *Smith v. Ross*, 482 F.2d 33 (6th Cir. 1973); *Putman v. Gerloff*, 639 F.2d 415 (8th Cir. 1981); *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972)). A law enforcement official is liable for the harm caused by the actions of other officers where the official observes or has reason to know that any constitutional violation is being committed by an officer and the official had a realistic opportunity to intervene to prevent the harm from occurring. *Bunkley v. City of Detroit*, 902 F.3d 552, 565-66 (6th Cir. 2018) (citing *Kaylor v. Rankin*, 356 F. Supp. 2d 839, 850 (N.D. Ohio 2005)).

In this case, both Defendants Ayala and Rocha were present and able to observe the full range of events from the time Plaintiff first came into sight of Defendants' scout car until his arrest. Both Defendants Ayala and Rocha testified their scout car was too far away from Plaintiff to observe what items he might have been carrying on his person. (ECF Nos. 12-2, PageID.102, 113; 12-6, PageID.149.) Defendant Rocha testified he did not observe Plaintiff make any furtive movements, nor did he make any observations that would have led him to suspect Plaintiff was carrying a firearm. (ECF No. 12-6, PageID.151, 155-56, 166.) At his deposition, Defendant Rocha could not recall if, prior to the *Terry* stop, Defendant Alleyne supplied him any details to support a reasonable suspicion that Plaintiff was armed, other than Defendant Alleyne stating his belief that this was so. (ECF No. 12-6, PageID.151, 155-56.) Defendant Ayala likewise testified that

8

Defendant Alleyne only stated his belief that Plaintiff was armed and not any details to support a reasonable suspicion. (ECF No. 12-2, PageID.101-02.) Defendant Ayala did testify he observed Plaintiff make a stuffing motion toward the center console after entering the vehicle. *Id.* at 114. A stuffing motion towards the center console immediately after entering a vehicle, however, is not an observation that alone provides officers a reasonable suspicion of criminal activity. Accordingly, there is sufficient evidence for a reasonable jury to conclude that Defendants Ayala and Rocha had reason to know there was not an objective, articulable basis for suspecting Plaintiff of criminal activity when he was stopped by Defendants. *See Smoak*, 460 F.3d at 778-79. The same is true for the probable cause required to search the vehicle after Plaintiff was stopped and patted down.

Although both Defendants Ayala and Rocha were present for the entire encounter with Plaintiff, there is no evidence Defendant Alleyne made either of them aware of what actions he planned to take before taking them. These circumstances are different to those in *Bunkley* — cited by Plaintiff. There, the defendant officers who arrested the plaintiff took time to request permission to make the arrest via a phone call to a supervisor in the presence of each other were denied qualified immunity and summary judgment on claims against them for false arrest and failure to intervene. 902 F.3d at 566; *see also Haliburton v. City of Ferndale*, 653 F. Supp. 3d 377, 402-04 (E.D. Mich. 2023) (denying summary judgment on failure-to-intervene claim where defendant officer was told by the searching officer plaintiff "had something crotched" and "perceived that [searching officer] was about to perform a search inside of [the plaintiff]'s pants by putting on gloves" before search occurred). Each of these *Bunkley* defendants knew the plaintiff was not questioned, he

9

did not match the victim's description of the perpetrators, and the underlying crime he was

arrested for had not been investigated before becoming aware one or more of them

planned to arrest the plaintiff anyway. 902 F.3d at 566. Here, without any advanced

warning as to what Defendant Alleyne would do, Defendants Ayala and Rocha would

have had to react instantaneously throughout the encounter to his actions, which were

themselves quick, to intervene. Accordingly, a reasonable jury could not conclude that

Defendants Ayala and Rocha had a realistic opportunity to intervene against Defendant

Alleyne's conduct, and Plaintiff's claims against them fail.

C.      **Plaintiff's Claims Against Defendant City of Detroit for the Conduct of Defendants Ayala and Rocha**

Plaintiff claims Defendant City of Detroit is liable for the actions of Defendants

Ayala and Rocha under a failure-to-train theory. (ECF Nos. 1, PageID.8-9; 16,

PageID.230-31.) A municipality is liable under § 1983 if a municipal policy or custom

caused the plaintiff's injury. *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S.

397, 403 (1997). A plaintiff seeking to hold a municipality liable for alleged constitutional

harms under the failure-to-train theory must establish that the municipality's "training

program is inadequate to the tasks that the officers must perform; that the inadequacy is

the result of the city's deliberate indifference; and that the inadequacy is 'closely related

to' or 'actually caused' the plaintiff's injury." *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir.

1989) (quoting *City of Canton v. Harris*, 109 S. Ct. 1197, 1205-06 (1989)).

Plaintiff points to deposition testimony from Defendant Ayala for support of his

claim that Detroit Police officers are trained not to intervene if they observe their partners

violating constitutional rights during stops. (*See* ECF No. 16, PageID.230.) A portion of

the relevant testimony is as follows:

10

Q: And knowing that you saw this constitutional violation as it was occurring, you did not stop that violation or that breaking of that particular aspect of the law. Is that correct?
A: Correct.
…
Q: And the department -- the department -- the Detroit Police Department really wants you to work with the same partner so that there's some fluidity in how you operate and some familiarity between the partners. Is that correct?
A: It varies, yes.
Q: Okay. But in this particular department, you describe yourself as working -- these are your regular partners that you typically worked with unless they were off or on vacation. Is that correct?
A: Yes.
Q: And that's something that's condoned and actually promoted by the department for you to work in that particular fashion. Is that correct?
A: Yes.
Q: Okay. And you were out there to support your partner?
A:                                                                                                         Yes.
Q:         You've         been         trained         to         do         that.
A: Correct.
. . .
Q: The department does not want you to have an argument or an objection to what Tylerscott Alleyne is doing to Mr. Pride on this particular day, and you to deal with it in a different way if you had some objection. Is that correct?
A: Correct.

(ECF No. 12-2, PageID.111.) Defendants point to the Detroit Police Department Manual, which contains definitions and guidance for Fourth Amendment issues that are not illegal on their face. (ECF No. 12, PageID.90.) Defendants also point to deposition testimony of individual Defendants that demonstrates their understanding of the reasonable suspicion and probable cause requirements. *Id.* Defendants do not, however, put forth any evidence to refute the inference from Defendant Ayala's testimony that Detroit Police officers have been trained not to intervene in constitutional violations by their partners. Based on this record, a reasonable jury could find the training was inadequate.

11

As for the second element, a plaintiff can demonstrate deliberate indifference by showing that the municipality was aware of complaints of repeated constitutional violations by its officers such that it had notice that the training for a particular area was inadequate and likely to cause injury but ignored that risk. *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020). Plaintiff has not presented any evidence showing repeated complaints of constitutional violations under similar circumstances to those alleged here or that Defendant City of Detroit had notice of such repeated instances.

Alternatively, deliberate indifference can be proved with "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Brown*, 520 U.S. at 409.[3] A reasonable jury could find that making *Terry* stops is such a recurring situation. A reasonable jury also could conclude that Detroit Police officers being trained not to intervene when they observe their partner violating an individual's constitutional rights during an investigative stop is a failure by Defendant City of Detroit to train its officers to "handle recurring situations presenting obvious potential for such a violation," *Brown*, 520 U.S. at 409, such that the "the need for more or different training is so obvious . . . that the . . . city can reasonably be said to have been deliberately indifferent." *Harris*, 109 S. Ct. 1197, 1205.

---

[3] In *City of Canton v. Harris*, the Court provided an example for such a situation: because a city knows "to a moral certainty" that its officers will be required to arrest fleeing felons and arms its officers with firearms to aid them in doing so, "the need to train officers in the constitutional limitations on the use of deadly force" is so obvious "that failure to do so could be characterized as deliberate indifference." 109 S. Ct. 1197, 1205, n.10 (1989) (internal quotation marks omitted).

Regarding the third element, a reasonable jury could not find based on this evidence that this training was "closely related to or actually caused" Plaintiff's alleged injuries. *McIntyre*, 884 F.2d at 275 (quoting *Harris*, 109 S. Ct. at 1205-06) (internal quotation marks omitted). This is because, as discussed above, Defendants Ayala and Rocha could not have caused Plaintiff's injuries by failing to intervene out of adherence to this training without a realistic opportunity to intervene in the first place. Therefore, Plaintiff fails to establish a genuine issue of fact on an element essential to this claim and summary judgment is appropriate.

**D.      Plaintiff's Claims Against Defendant City of Detroit for Defendant Alleyne's Conduct**

Plaintiff alleges Defendant City of Detroit is liable for the actions of Defendant Alleyne based on Defendant City of Detroit's failure to supervise, investigate, or discipline him. (ECF Nos. 1, PageID.8; 16, PageID.231.) Similar to a failure-to-train claim, a plaintiff seeking to hold a municipality liable for a failure to supervise or inaction must show: (1) a clear and consistent pattern of previous complaints of similar constitutional violations, *Pineda v. Hamilton County*, 977 F.3d 483, 496 (6th Cir. 2020); (2) the city knew or should have known of this pattern, *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246-47 (6th Cir. 1989); (3) the city's deliberate indifference by failing to act amounts to tacit approval of the behavior and a policy or custom of inaction, *J.H. v. Williamson County*, 951 F.3d 709, 723 (6th Cir. 2020) (citing *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)); and (4) the city's policy or custom of inaction caused the alleged constitutional violations, *Doe*, 103 F.3d at 508.

Here, Plaintiff does not present the Court with evidence that Defendant City of Detroit knew or should have known that Defendant Alleyne has a history of similar

13

constitutional violations. Plaintiff cites to a report that appears to show Defendant Alleyne's personnel file as a Detroit Police officer, including a list of citizen complaints, but this exhibit tells the Court little about the details of any citizen complaints or disciplinary actions, such as what constitutional issues might have been involved or the frequency of any such events. (*See* ECF No. 16, PageID.231.) Plaintiff fails to raise a genuine dispute of material fact regarding his claim against Defendant City of Detroit for Defendant Alleyne's conduct.

## IV.    Conclusion

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment. Defendants' motion for summary judgment is DENIED as to Plaintiff's claims against Defendant Alleyne in his individual and official capacities. Defendants' motion for summary judgment is GRANTED as to Plaintiff's claims against the City of Detroit for the conduct of Defendants Alleyne, Ayala, and Rocha. Defendants' motion for summary judgment is GRANTED as to Plaintiff's claims against Defendants Ayala and Rocha in their individual and official capacities.


SO ORDERED.

s/ Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: September 18, 2024


I hereby certify that a copy of the foregoing document was served upon counsel of record on September 18, 2024, by electronic and/or ordinary mail.

s/ Marlena Williams
Case Manager